UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CATHERINE "LILY" THOMAS,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Civil No. 3:22-cv-10356-KAR
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
JENNIFER WHITCOMB and⠀⠀⠀⠀⠀)
DEERFIELD ACADEMY,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 38)

ROBERTSON, U.S.M.J.

⠀⠀⠀⠀Catherine "Lily" Thomas ("Plaintiff") is suing Deerfield Academy ("Deerfield" or "the

Academy") for breach of contract (Count One) and negligent retention (Count Three) of

Deerfield employee Jennifer Whitcomb ("Ms. Whitcomb," and collectively with Deerfield,

"Defendants") (Dkt. No. 1 at 14-16).  Plaintiff also asserts a claim against Ms. Whitcomb for

negligent infliction of emotional distress (Count Two) (Dkt. No. 1 at 15).[1]  Presently before the

court is a motion by Defendants for summary judgment in their favor on all counts (Dkt. No. 38).

The parties have consented to this court's jurisdiction (Dkt. No. 22).  *See* 28 U.S.C. § 636(c);

---

[1] Plaintiff has represented that she is voluntarily withdrawing her claim for injunctive relief under the Americans with Disabilities Act ("ADA") (Count Four) as moot (Dkt. No. 48 at p. 1). However, a plaintiff may only dismiss an action without a court order after the opposing party has answered or moved for summary judgment by filing a stipulation of dismissal signed by all parties who have appeared.  *See* Fed. R. Civ. P. 41(a).  Plaintiff has not filed such a stipulation but given Plaintiff's representation that she wishes to abandon her ADA claim on mootness grounds, the court dismisses it with prejudice.

Fed. R. Civ. P. 73.  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## I.    LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome.  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

## II.    FACTUAL BACKGROUND[2]

Plaintiff began attending Deerfield, a private secondary boarding school, at the beginning of the 2019-2020 academic year and was enrolled there in the fall of 2021 for her junior year (SOF ¶ 1).  Plaintiff was a dancer and took dance classes for academic credit, as well as cocurricular classes (SOF ¶ 9).  Ms. Whitcomb has a 34-year tenure as the Director of the Deerfield Dance Department and was in that role during Plaintiff's time at Deerfield (SOF ¶¶ 10-11).  In addition to her administrative duties, Ms. Whitcomb taught dance classes at the school, including modern and contemporary dance and choreography, but she did not teach ballet (SOF ¶¶ 12-13).  Plaintiff was taught ballet by Carrie Towle ("Ms. Towle"), Deerfield's Ballet Specialist, who also provided private dance coaching to Plaintiff (SOF ¶¶ 14-15).

Every year, Deerfield puts on a performance of *The Nutcracker* during the lead-up to the holiday season, which Ms. Towle managed under Ms. Whitcomb's oversight during the relevant time-period (SOF ¶¶ 16, 18).  In the summer of 2021, Plaintiff was cast to perform the role of the Sugar Plum Fairy solo for the upcoming show that fall, while another student, Ella, was cast to perform as the Sugar Plum Fairy in the pas de deux (SOF ¶¶ 40-41; Dkt. 40-4 at 11).  The year before, Plaintiff had been cast in the Marzipan trio and had asked Karen St. Pierre ("Ms. St. Pierre"), Deerfield's full-time Costume Designer, if Plaintiff's mother could purchase her a bodice for her assigned role.  Ms. St. Pierre had advised Plaintiff that this was not allowed (SOF ¶¶ 45, 67-69).  Nevertheless, on July 28, 2021, Plaintiff, now having been cast as the Sugar Plum Fairy, reached out to tutu.com inquiring about ordering a custom tutu for that role.  She followed

---

[2] The court draws the facts from Plaintiff's Response to Defendants' Rule 56.1 Statement of Material Facts Establishing a Genuine Issue to be Tried (Dkt. No. 46), which includes Defendants' Local Rule 56.1 Statement of Material Facts (Dkt. No. 40), as well as Plaintiff's responses thereto, and from the materials cited.  Unless stated otherwise, the facts are undisputed.

up on September 6, 2021, about starting the process in time for the performance, which was to take place on December 12, 2021 (SOF ¶¶ 43-44).

After starting the design process with tutu.com, on September 25, 2021, Plaintiff told Ms. Towle that she did not have to worry about Plaintiff's costume for *The Nutcracker* (SOF ¶ 48). Ms. Towle informed Plaintiff that all costuming decisions were the full purview of Ms. St. Pierre and Ms. Whitcomb and that Plaintiff would have to go through them with any costume plans she was making (SOF ¶¶ 45, 48-49).  When Plaintiff later brought up the idea of wearing a custom tutu again with Ms. Towle, Ms. Towle reiterated the requirement that Plaintiff discuss her plans with Ms. St. Pierre and Ms. Whitcomb (SOF ¶ 50).  Plaintiff responded that she would wait until after the Deerfield Fall Showcase performance, which was keeping Ms. St. Pierre quite busy (SOF ¶ 50).

By late October, Plaintiff and her mother, Helen Thomas ("Ms. Thomas"), contacted Ms. Whitcomb and Ms. St. Pierre about the custom tutu.  Specifically, on October 28, 2021, Ms. Thomas emailed Ms. Whitcomb and Ms. Towle telling them that she had purchased "something special" for her daughter because she had been working for the role of the Sugar Plum Fairy for twelve years and dancing the role was her "dream coming true" (SOF ¶ 55; Dkt. No. 40-22). Three days later, Plaintiff emailed Ms. Whitcomb and Ms. St. Pierre revealing that the "something special" was the custom tutu; Plaintiff claimed that she "recently found out that [her] mom brought [her] a tutu with a bodice for [her] sugar plum variation," and asked permission to wear it in *The Nutcracker* performance on December 12, 2021 (SOF ¶ 56; Dkt. No. 40-23).  Ms. Whitcomb responded to both Ms. Thomas and Plaintiff on November 3, 2021 (SOF ¶¶ 57-58). Ms. Whitcomb advised Ms. Thomas that it was the Dance Department's "costuming policy" to supply all costumes out of the costuming budget, with Ms. St. Pierre having an "overarching

4

look for each of the shows that she costumes" (SOF ¶ 57). Ms. Whitcomb noted that Ms. St. Pierre had purchased tutus specifically for Plaintiff and Ella to wear for the performance "that would distinguish them as principal dancers while relating in color scheme and quality" (SOF ¶ 56). Ms. Whitcomb relayed the same information about the costuming policy and Ms. St. Pierre's purchase of tutus for Plaintiff and Ella in a separate email response to Plaintiff (SOF ¶ 58).[3]

Notwithstanding Ms. Whitcomb's response, Plaintiff moved forward with the purchase of the custom tutu. On November 14, 2021, Plaintiff emailed tutu.com with some thoughts on fabric swatches and reminded them of the December 12, 2021, date for the performance (SOF ¶ 62). Plaintiff also emailed tutu.com on November 19, 2021, choosing the colors for her tutu (SOF ¶ 75). Plaintiff maintains that she proceeded to order the custom tutu because Ms. St. Peirre told her the tutus she had ordered might not arrive in time and because Plaintiff hoped Deerfield would grant her request to wear the custom tutu, although Ms. St. Pierre has averred

---

[3] Plaintiff purports to dispute the fact that the Dance Department had a policy requiring dancers to wear Deerfield costumes for performances based on (1) her deposition testimony that one dancer wore her own tutu when she performed the role of the Sugarplum Fairy in the fall 2019 performance of *The Nutcracker* and that Plaintiff and her duet partner wore their own leotards in the 2021 Spring Showcase; (2) her brother's deposition testimony that he, as a Deerfield basketball and baseball player, was expected to provide some of his own equipment and that the majority of his equipment, including his uniform pants for games, was his own; and (3) an affidavit from Plaintiff attesting that she was required to purchase her own practice attire, as well as her own tiara for the 2021 performance of *The Nutcracker* (SOF ¶ 57; Dkt. 46-2 at 7). Plaintiff's asserted bases for contesting the existence of the policy are insufficient to create a dispute of fact. Whether the Dance Department had a policy regarding attire for practices and showcases or accessories for shows is not in issue, nor is whether Deerfield had a policy regarding equipment for student athletes. The only evidence that potentially calls into question the existence of the costume policy is Plaintiff's testimony that the dancer in the role of the Sugarplum Fairy in the 2019 performance wore her own tutu, but that was two years earlier, and Plaintiff has not disputed Deerfield's evidence that not only Plaintiff, but also Ella and her dance partner were told that they could not wear non-Deerfield provided costumes for the 2021 performance based on the policy (Dkt. No. 46 at ¶¶ 51-53).

that she told Plaintiff that it was "very unlikely" the tutus would not arrive on time and that, even if they did not, allowing Plaintiff to wear a custom tutu would be the last option after looking for a suitable tutu in inventory (SOF ¶ 62).

On November 30, 2021, Ms. St. Pierre sent an email to several of the dancers, including Plaintiff, advising them to make an appointment to be fitted for their costumes for the upcoming show (SOF ¶ 76; Dkt. No. 40-20 at ¶ 32). When Plaintiff failed to respond to the email, Ms. St. Pierre sent her a follow-up email one week later, on December 6, 2021, telling her she had to schedule a time for her fitting that day or the following day at the latest (SOF ¶ 76; Dkt. No. 40-20 at ¶¶ 33-34). Ms. St. Pierre stayed later in the day on December 6, 2021, for Plaintiff to try on the tutu following a practice that Plaintiff did not want to miss (SOF ¶¶ 77-78). When Plaintiff tried on the costume, there were pins holding on some trim, but Ms. St. Pierre told Plaintiff that she would have the pins taken care of by the following day so that Plaintiff could start practicing in it right away (SOF ¶ 81).

The next day, however, Plaintiff went to Ms. St. Pierre's office unannounced with her custom tutu from tutu.com and asked Ms. St. Pierre to look at it (SOF ¶¶ 83-84). Ms. St. Pierre agreed to look at it but reiterated that Plaintiff would have to wear the Deerfield tutu for the performance (SOF ¶ 84). Ms. St. Pierre pinned the straps on the custom tutu at Plaintiff's request but declined to sew them for Plaintiff when Plaintiff asked (SOF ¶¶ 85-86). After Plaintiff sewed the straps herself, she again asked if she could wear the custom tutu for the performance and Ms. St. Pierre again told her that she could not, whereupon Plaintiff began to argue about why she felt she should be allowed to wear it (SOF ¶¶ 88-89).

On December 8, 2021, Plaintiff met with Joshua Relin, Psy. D., in Deerfield's counseling center (SOF ¶ 91). Plaintiff had previously met with Dr. Relin in October 2020, when she told

him she was experiencing anxiety at being called on in dance class or in academic settings to demonstrate her knowledge.  At the time, Plaintiff was interested in getting extended time on exams, which Dr. Relin told her would require a neuropsychological evaluation (SOF ¶¶ 19-20, 26).  Shortly after that initial meeting, when Plaintiff indicated that she was ready to proceed, Dr. Relin reached out to Sheryl Koyama, Deerfield's Director of Academic Support in the Academic Affairs Office, to coordinate neuropsychological testing and to put a provisional accommodation for extra time in place (SOF ¶¶ 21-25).  Thereafter, Plaintiff requested, and Deerfield granted, remote learning for Plaintiff for the winter term of 2020-2021 (SOF ¶ 27).  Meanwhile, Christopher M. Rose, Psy. D., to whom Ms. Koyama had referred Plaintiff for evaluation, diagnosed Plaintiff with Generalized Anxiety Disorder ("GAD"), noting that Plaintiff reported anxiety related to tests and other forms of performance anxiety as well, although he did not mention anything about dance performances in particular in his report (SOF ¶¶ 28-30; Dkt. No. 14-13 at 3).  Dr. Rose recommended that Deerfield allow Plaintiff time-and-a-half on classroom tests and quizzes, as well as standardized testing, which the Academic Affairs Department adopted as an academic accommodation (SOF ¶¶ 30-32).  Moving forward once again to December 8, 2021, Plaintiff told Dr. Relin that she was feeling very anxious and upset over the custom tutu situation, about which he had no prior knowledge (SOF ¶ 92).  When Plaintiff asked Dr. Relin to advocate on her behalf, he agreed that he would confirm what she had told him about the situation but that he could not say it was a medical necessity that she dance in her own costume (SOF ¶¶ 94-95).

The same day Plaintiff met with Dr. Relin, Plaintiff emailed Ms. Whitcomb apologizing for the conflict she may have caused and providing her "perspective" (SOF ¶ 96; Dkt. No. 40-32).  Plaintiff explained that she had "worked so hard for this moment" and viewed performing

the Sugar Plum Fairy solo as a "milestone in [her] life as a dancer," for which she had been

designing the custom tutu since her seventeenth birthday over the summer (Dkt. No. 40-32).

Plaintiff maintained that the tutu Ms. St. Pierre had purchased for her was "too heavy to

maneuver the turning sequence … in the last minute of [her] solo" (Dkt. No. 40-32). Plaintiff

noted that her turns had been inconsistent and that she was hoping to wear her custom tutu "to

ensure consistency in performance as well as safety" (Dkt. No. 40-32). Plaintiff ended by asking

Ms. Whitcomb for her consideration in making an exception to the policy to take into "account

safety and the dedication [she] ha[d] put into [her] training by allowing [her] to perform in the

tutu [she] designed [over the] summer for this special occasion" (Dkt. No. 40-32). Ms.

Whitcomb responded reiterating that Plaintiff was to wear the Deerfield tutu per the policy as she

had been told several weeks earlier (SOF ¶ 97; Dkt. No. 40-33). Ms. Whitcomb noted that

Plaintiff had not yet practiced in the Deerfield tutu and encouraged her to do so daily going

forward; Ms. Whitcomb told Plaintiff she would make sure Plaintiff had access to the costume

even when the dance instructors were not on campus for this purpose (SOF ¶ 97).

On December 9, 2021, Ms. Thomas called Dr. Relin on behalf of her daughter, telling

him that she thought the Dance Department's refusal to allow Plaintiff to wear the custom tutu

was unfair to Plaintiff and was putting her through an undue burden (SOF ¶ 100). Dr. Relin

recalls telling Ms. Thomas that he would confirm Plaintiff's anxiety diagnosis and his awareness

that the tutu situation had been stressful for her, but he would not advocate for a particular

outcome or represent that it was a medical necessity for Plaintiff to wear the custom tutu (SOF ¶

100). Ms. Thomas recalled Dr. Relin saying that he, as a member of the Health Center, could not

tell Ms. Whitcomb, as a faculty member, what to do (SOF ¶ 100).[4]  Following her discussion

with Dr. Relin, Ms. Thomas emailed Ms. Whitcomb, telling her that Dr. Relin wanted her to

reach out to him immediately and get back to her "regarding [her] daughter's mental state given

the history of her anxiety" (SOF ¶ 101).  This prompted Ms. Whitcomb to reach out to Dr. Relin

and explain the Dance Department's policy of requiring dancers to wear Deerfield costumes.  Dr.

Relin told Ms. Whitcomb that Lily was diagnosed with GAD and that the situation had been

stressful for her, but he did not recommend that Ms. Whitcomb make an exception to the policy

for Plaintiff (SOF ¶ 102).[5]

Ms. Thomas reached out to John Austin, Deerfield's Head of School, on December 10,

2021 (SOF ¶ 104).  The only concern Dr. Austin recalls Ms. Thomas raising with him was that

she had purchased the custom tutu because Plaintiff's performance would be part of her college

application, and she wanted to make sure Plaintiff could be filmed in it for that purpose (SOF ¶¶

106-107; Dkt. No. 40-37 at p. 7).  According to Ms. Thomas, however, she told Dr. Austin that

Plaintiff had expended much effort to create the costume "to have a safe and good performance

because she [was] under a lot of stress" and that the school was "well aware" of Plaintiff's

anxiety (SOF ¶ 106; Dkt. No. 46-14 at p. 5).  Ms. Thomas testified that she pleaded for Dr.

Austin's support, that the "accommodation [was] important," and that she would donate the

costume to Deerfield to bring it into compliance with the Dance Department policy (SOF ¶ 106;

Dkt. No. 46-14 at p. 5).  While Ms. Thomas recalled Dr. Austin telling her only that he would

---

[4] Ms. Thomas also testified at her deposition that Dr. Relin's notes from December 9, 2021,
which she was asked to review, reflected that they were making a "clear request for
accommodation," and that he did not say it was "not [an] accommodation," but the contents of
Dr. Relin's note are not consistent with Ms. Thomas's representation (Dkt. No. 40-34).
[5] The parties dispute whether Ms. Whitcomb had previous knowledge of Plaintiff's diagnosis of
GAD, but the dispute is not material (Dkt. No. 46 at ¶¶ 37-38).

speak to Ms. Whitcomb, Dr. Austin remembers telling Ms. Thomas that he was reluctant to reverse Ms. Whitcomb's decision or the Dance Department policy (SOF ¶ 108; Dkt. No. 46-14 at p. 5). When Dr. Austin spoke to Ms. Whitcomb later that day, he told her that had had become aware of the custom tutu situation and supported her decision (SOF ¶ 109).

The technical rehearsal ("the tech rehearsal") for *The Nutcracker* performance was held on December 10, 2021 (SOF ¶ 111). It is undisputed that Plaintiff showed up late for the cast warmup beforehand, which all dancers are required to attend to enhance the performance and reduce the risk of injury (SOF ¶ 112). According to Plaintiff, her tardy arrival was due in part to her ongoing anxiety and stress over the custom tutu situation and in part to needing to assemble the tiara Deerfield had required her to purchase for the performance (SOF ¶¶ 111-112). Plaintiff appeared shortly before she was to go on stage wearing her custom tutu (SOF ¶¶ 111, 113). Ms. Towle approached her and expressed confusion about why Plaintiff was wearing the custom tutu (SOF ¶ 114). According to Plaintiff, Ms. Towle raised her voice and told Plaintiff she was being selfish and that she would not have expected this behavior from her (SOF ¶ 114). Ms. Towle has submitted a declaration attesting that she did not feel she had the authority to tell Plaintiff she could not rehearse in the custom tutu, so she allowed Plaintiff to wear it for the tech rehearsal and told Plaintiff to take the issue up with Ms. Whitcomb, who was not present, the following day (SOF ¶¶ 115-117). Plaintiff professes to dispute this fact, arguing that Ms. Towle had "full authority and control" over the tech rehearsal based on Ms. Towle's representations in an affidavit that she manages the production of *The Nutcracker* and is generally responsible for it as overseen by Ms. Whitcomb (SOF ¶ 115). As set forth above, however, Plaintiff does not dispute that all costuming decisions belonged to Ms. Whitcomb and Ms. St. Pierre, not to Ms. Towle.

On December 11, 2021, Ms. Whitcomb emailed Plaintiff reiterating the requirement that all dancers, including Plaintiff, wear Deerfield costumes, which Plaintiff had failed to do for the tech rehearsal, and recommending Plaintiff practice in the Deerfield tutu that afternoon (SOF ¶ 118; Dkt. No. 40-38).  Ms. Towle echoed Ms. Whitcomb's message with an email of her own to Plaintiff reminding her of the requirement that she wear the Deerfield tutu as she had "been told clearly and unequivocally," and asking her to "reply to the email, letting [Ms. Towle] know that [she] under[stood] and [would] arrive, without dissent, in the [Deerfield] Sugar Plum tutu [that] evening" (SOF ¶ 119; Dkt. No. 40-39).  The record does not reflect a response.  Plaintiff spoke with Dr. Relin that day due to her anxiety and missed the finale rehearsal at 2:30 p.m. (SOF ¶ 121).

Later that afternoon, Ms. Towle was told by another student dancer that Ms. Thomas had spoken to her and two other performers, leaving them with the impression that they were not being good friends to Plaintiff by not standing up for her mental health and suggesting that if they did not stand up for Plaintiff, something bad could happen to Plaintiff (SOF ¶ 122).  Ms. Thomas acknowledges approaching three Deerfield dancers but testified that all she said to them was that Plaintiff's condition was serious and no one was taking it seriously (SOF ¶ 122).  Either way, Ms. Towle shared the information she had about the encounter with Ms. Whitcomb.  The two were concerned about what was happening with Plaintiff and reached out to Dr. Relin, who indicated that Plaintiff's behavior did not appear to be a precursor to a nervous breakdown (SOF ¶ 123).

Dr. Relin reached out to Ms. Thomas to notify her of his contact with Ms. Whitcomb and Ms. Towle.  Ms. Thomas emailed him back, copying Ms. Whitcomb and Ms. Towle, with the subject line "deteriorated Condition Saturday December 11, 2021," describing Plaintiff as "not

well!," "angry and unstable," and unable to function (Dkt. No. 40-41).  Ms. Thomas stated that

Plaintiff's "known anxiety ha[d] been neglected in the dance program for too long," but

indicated her "hope [that] Plaintiff [might] get better before [the] performance" (Dkt. No. 40-41).

Ms. Thomas also emailed Ms. Whitcomb, copying, among others, Ms. Towle, and stating that

Plaintiff was so unwell she would be unable to dance in the full-dress rehearsal that evening but

indicating that she would "like to figure out how we may address [Plaintiff's] condition in order

for her to be able to perform possibly tomorrow" (SOF ¶ 126; Dkt. No. 40-42)).  Ms. Whitcomb

responded that they would hold Plaintiff's spot in the hopes she could dance in the performance

the following day but repeating the "firm" requirement that Plaintiff wear the Deerfield costume

(SOF ¶ 127; Dkt. No. 40-43).  Nevertheless, given the ongoing situation with Plaintiff, Ms.

Towle told Ella that she would be dancing the Sugar Plum Fairy solo along with the pas de deux

(SOF ¶ 131).  Ms. Thomas separately contacted Dean of Faculty John Taylor, who was the

School Officer in Charge for the weekend, as well as Julie Schloat, Plaintiff's advisor, telling

them Plaintiff had checked in with the Health Center and expressing her hope that "the school

will come to [Plaintiff's] rescue before tomorrow's performance that means the world to her"

(SOF ¶ 132; SOF Dkt. No. 40-44).

Ms. Whitcomb and Ms. St. Pierre spoke later that evening and arrived at what they

considered a possible solution – Plaintiff would wear the tutu with the "lighter skirt and smaller

waist and hips" that had been assigned to Ella, and Ella would wear the tutu originally assigned

to Plaintiff (SOF ¶ 134; Dkt. No. 40-46).  In the evening on December 11, 2021, Ms. Whitcomb

emailed Plaintiff, copying Ms. Thomas and others, advising Plaintiff of this option and telling

Plaintiff that she would be available to speak to her, her mother, and her advisor by phone or in

person starting at 7:00 the following morning in advance of the performance (SOF ¶ 136).  Ms.

Whitcomb closed her message by saying, "I feel confident that we can find a solution that will support you in this endeavor" (Dkt. No. 40-46).

On the morning of the show, Ms. Whitcomb told Ms. Towle that she was optimistic Plaintiff would wear the Deerfield tutu as required, leading Ms. Towle to alert Ella that it was now more likely than not that Plaintiff would dance the Sugar Plum Fairy solo (SOF ¶ 138). In spite of Ms. Whitcomb's optimism, Plaintiff did not arrive at the dance studio until 11:45 a.m. with her custom tutu and accompanied by Ms. Thomas, Plaintiff's brother, and Ms. Thomas's then-partner (SOF ¶ 140). Plaintiff again asked Ms. Whitcomb if she could wear the custom tutu in the performance, and Ms. Whitcomb again told her no (SOF ¶ 141). Plaintiff neither agreed or explicitly refused to wear the Deerfield costume, nor did she try it on or practice in it, although Plaintiff maintains that she was not wearing appropriate clothing to do so (SOF ¶ 142, 144). Ms. Thomas began to speak to Ms. Whitcomb regarding Plaintiff wearing the custom tutu in a manner that Ms. Whitcomb and Ms. St. Pierre characterize as intimidating and that left them shaken, leading Ms. Whitcomb to place a call to campus security (SOF ¶¶ 143, 146). Plaintiff then left the studio with her mother, brother, and her mother's partner (SOF ¶ 142).

While Plaintiff denies that she explicitly refused to perform in the Deerfield costume, Ms. Whitcomb and Ms. Towle maintain that, based on Plaintiff's conduct, they determined that she would not be performing, and Ms. Towle notified Ella that she would be dancing the Sugar Plum Fairy solo in Plaintiff's stead (SOF ¶¶ 147-148). However, Plaintiff claims that as she was walking back to her room from the studio, she decided that she would wear the Deerfield tutu, and she texted Ms. Towle at 12:08 p.m. that she would be at the studio to begin rehearsing at 1:00 p.m. (SOF ¶ 151-152). Ms. Towle saw Plaintiff's text at 12:30 p.m., and responded by telling Plaintiff to check her email, whereupon she sent an email to Plaintiff, copying Ms.

13

Whitcomb, telling Plaintiff that "[h]er exit from the studio was understood as a clear statement of choosing not to participate in the show," and that a decision had been made to pull her. Ms. Towle directed Plaintiff to take up any questions with Ms. Whitcomb as she, Ms. Towle, was in the midst of getting ready to put on the show (SOF ¶¶ 153-155). Ms. Towle also asked a security guard who had responded to the studio after Ms. Whitcomb's call not to let Plaintiff into the studio if she appeared in the hopes of avoiding a scene that had the potential to upset the other performers (SOF ¶ 157). Withal, Plaintiff showed up at the studio with her hair and makeup done, and the security guard allowed her to enter (SOF ¶¶ 158-159). When Plaintiff asked Ms. St. Pierre if she could put on the Deerfield tutu, Ms. St. Pierre assumed that a decision had been made to allow Plaintiff to dance, so she gave Plaintiff the tutu and left her to put it on in the changing area behind a curtain in the studio (SOF ¶¶ 159-161).

When Ms. Towle learned of Plaintiff's arrival, she entered the studio where she claims she found Plaintiff dressed in the tutu that had originally been assigned to Ella; she asked Plaintiff to step into the hallway with her and the security guard while they waited for Ms. Whitcomb, who she had called to the studio when she found out Plaintiff was there (SOF ¶¶ 163-165). Plaintiff, on the other hand, maintains that Ms. Towle abruptly yanked open the curtain while Plaintiff was still changing and half-naked from the waist up and demanded Plaintiff come with her (SOF ¶ 165). In the meantime, Ms. Whitcomb arrived at the studio and, upon receiving a call from Mr. Taylor, advised him that she was inclined in the confusion of the moment to let Plaintiff dance (SOF ¶ 167). When Ms. Whitcomb and Ms. Towle found one another, Ms. Whitcomb suggested the same to her (SOF ¶ 168). Defendants represent that only 15 minutes remained until curtain at this time (SOF ¶ 169). Plaintiff purports to dispute this timeline based on her deposition testimony that she arrived at least one hour before curtain (SOF ¶ 169).

Either way, time was short and Ms. Towle reports feeling that the decision was out of her hands, so she and Ms. Whitcomb went to find Ella to let her know that Plaintiff would be dancing after all and to inquire as to which tutu Ella would prefer to wear (SOF ¶¶ 171-172). Ella reacted with visible upset upon hearing the news, leading Ms. Towle to tell Ms. Whitcomb that she disagreed with the decision to allow Plaintiff to dance, and Ms. Whitcomb ultimately agreed with her (SOF ¶¶ 173-175). Ms. Towle and Ms. Whitcomb then went back to the hallway where Plaintiff was waiting with the security guard; Ms. Towle told Plaintiff that she would not be dancing and needed to change out of the tutu so that Ella could have it, which Plaintiff proceeded to do (SOF ¶¶ 176-177, 181). Thereafter, the show went on without Plaintiff.

Plaintiff returned to Deerfield in January 2022, following the winter recess, but she went on a medical leave of absence shortly thereafter due to continued stress and anxiety (SOF ¶ 191). Subsequently, rather than returning to Deerfield, Plaintiff continued her education at Laurel Springs School (SOF ¶ 192).

Following Plaintiff's removal from *The Nutcracker*, Dr. Taylor along with Ivory Hills, Deerfield's then Dean of Academic Affairs, conducted a post-incident investigation and created a confidential investigation report (Dkt. No. 40-51 at ¶ 7 & Ex. A). The "primary purpose of th[e] investigation was to determine if the Academy or employees of the Academy had engaged in 'bullying' of [Plaintiff] or violated [Deerfield] policies with [Plaintiff]" due to either "the late notice to [Plaintiff] that [she]ld not be allowed to wear [her] desired costume in *The Nutcracker*," or "a specific and relevant request under the Americans with Disabilities Act (ADA) that was not appropriately addressed" (Dkt. No. 40-51 at 6). The investigation findings were that Plaintiff was informed multiple times of the requirement that dancers wear Deerfield costumes, and "no specific ADA-justified request was made to the school" before the performance (Dkt. No. 40-51

at 7). By way of conclusions, the report found that "Academy policy seem[ed] to have been clearly communicated and implemented," and, while Ms. Thomas invoked the ADA after *The Nutcracker* performance, "[t]here [wa]s no evidence that the ADA was invoked prior to *The Nutcracker* to justify wearing the desired personal-tutu" (Dkt. No. 40-51 at 9).

The first count of Plaintiff's complaint is for breach of contract. The relationship between the parties was memorialized in a 2021-2022 Enrollment Agreement between Deerfield and Plaintiff's parents, as Plaintiff was a minor at the time (SOF ¶¶ 2-3). By signing the Enrollment Agreement, Plaintiff's parents represented that they had "read the most recently available Deerfield Academy Student Handbook and underst[ood] the Academy's rules and policies including its academic and disciplinary procedures," agreed "to remain well-informed of the rules and policies in the event they [were] changed or updated," and acknowledged their understanding that Plaintiff would be "subject to the rules and regulations of Deerfield Academy as articulated in the Student Handbook, as well as [Deerfield's] policies, rules, regulations, and practices" (Dkt. No. 40-2 at 2). Plaintiff's parents also indicated "consent to the Academy's application of its standards of behavior to [Plaintiff] through disciplinary actions … at any time in the Academy's sole and absolute discretion," and acknowledged that "the Academy reserve[d] the right, [sic] to discipline … [Plaintiff] if the Academy conclude[d] in its sole and absolute discretion that [Plaintiff] ha[d] engaged in any behavior … that, in the Academy's sole and absolute judgment, violate[d] an academic or disciplinary rule, policy, or standard" (Dkt. No. 40-2 at 2-3). The Enrollment Agreement contained a liability release providing as follows:

> In consideration of admission to and attendance at the Academy, on behalf of myself and my child, I hereby release, discharge and indemnify the Academy, its employees and/or agents from any action, claim or suit arising out of or resulting from any academic or disciplinary actions related to my child or myself. The

Academy reserves the right to alter its program or institute health and safety protocols in appropriate situations.

(SOF ¶ 5).

Deerfield's 2021-2022 Student Handbook ("the Handbook"), entitled "Rules and Expectations for Deerfield Students 2021-2022," addressed the topics of discrimination and retaliation on which Plaintiff purports to rely in bringing her breach of contract claim. The first "Major School Rule" in the Handbook proscribed "Mistreatment of Others," examples of which included discrimination on the basis of disability and retaliation. Specifically, the rule provided that "Deerfield d[id] not tolerate harassment or discrimination in any form, and … w[ould] act quickly and decisively when such actions [we]re brought to [its] attention" (Dkt. No. 40-5 at 6). The Handbook defined "discrimination" as the "mistreatment or [sic] a person based on actual or perceived characteristics," including disability, while "retaliation" was defined as "any form of intimidation, reprisal, or harassment by a school community member directed against another school community member for reporting or filing a complaint … or for taking action consistent with this Policy" (Dkt. No. 40-5 at 28). The Handbook designated the Dean of Faculty as a school official responsible for receiving reports and complaints of violations of the Policy and provided that, upon receipt of a report, the designated official was required to investigate to determine if the allegations could be substantiated and whether to resolve the complaint through "Formal or Informal Proceedings" (Dkt. No. 40-5 at 28). The final page of the Handbook provided that "[t]hese rules are not a legal contract, nor do they grant any additional rights or guarantees to any person" (SOF ¶ 8; Dkt. No. 40-5 at 30).

The parties dispute whether prohibiting Plaintiff from dancing in *The Nutcracker* was disciplinary or academic, so as to trigger application of the release provision in the Enrollment Agreement. Deerfield characterizes the decision to remove Plaintiff from the production as

17

disciplinary based on Plaintiff's conduct leading up to the performance, which Ms. Towle characterized as Plaintiff "having missed required critical rehearsals, without any communication with [her] or attempt to obtain permission to do so, and ha[ving] been repeatedly irresponsible, defiant and manipulative" (SOF ¶¶ 174, 182). It is undisputed that all dancers, including Plaintiff, were clearly informed at each audition, and then later in rehearsals, that an unexcused failure to attend a rehearsal is grounds for dismissal from the performance, that this standard of behavior and consequence is common knowledge in the Dance Program, and that other dancers have been cut from performances for lesser infractions than Plaintiff's infractions (SOF ¶¶ 178-180). Plaintiff also does not dispute that Ms. Whitcomb and Ms. Towle had the discretion to remove a student, including Plaintiff, from a performance when, in their opinion, the student failed to follow the rules and negatively impacted the experience of other students and, further, that not all discipline at Deerfield required a formal process (SOF ¶¶ 186-187).

Plaintiff, on the other hand, maintains that she was cut from *The Nutcracker* in retaliation for requesting, then persisting in her request, for a reasonable accommodation in the form of wearing her custom tutu and to cover Ms. Whitcomb's and Ms. Towle's mishandling of the situation which caused Ella distress (SOF ¶ 182). Plaintiff disputes the characterization of the sanction as disciplinary on the ground that she showed up the day of the performance ready to comply with the costume policy by dancing in the Deerfield costume; that Plaintiff's mother communicated that Plaintiff would be missing the full dress rehearsal; and that Plaintiff was not told that she would be, or had been, cut from the show after being late for the tech rehearsal or missing the finale and full-dress rehearsals (SOF ¶ 182). Plaintiff maintains that the fact that her removal from the performance was not disciplinary is shown by the facts that, after Plaintiff missed the full-dress rehearsal, Ms. Whitcomb wrote to Ms. Thomas, "we'll hold [Plaintiff's]

spot in the performance in the sincere hope that she feels well enough to perform tomorrow," while Dr. Taylor emailed just before the show was to begin, "I hope [Plaintiff] changes her mind and chooses to participate in the Nutcracker wearing the school-provided costume" (SOF ¶ 182).

Plaintiff also brings a claim against Ms. Whitcomb for negligent infliction of emotional distress and against Deerfield for negligent retention of Ms. Whitcomb. Plaintiff bases the latter claim on Ms. Whitcomb having the nickname "Bitchcomb" because she was such an "iron fist" (SOF ¶ 205). Plaintiff identifies eighteen individuals, including seventeen students and one dance instructor, who she asserts used the term "Bitchcomb" to refer to Ms. Whitcomb (SOF ¶¶ 206-207). Plaintiff further testified that Ms. Schloat, her academic advisor, told her that Ms. Whitcomb had a "history of other advisees … who had confrontations with [her] and they weren't heard or their problems weren't addressed and it was always Ms. Whitcomb's way and that really affected … the mental health of a lot of people … that [Ms. Schloat] kn[e]w of" (SOF ¶¶ 197-198, 204; Dkt. No. 46-13 at 10). Plaintiff elaborated that Ms. Schloat told her a story about a particular dancer from before Plaintiff's time at Deerfield, whose name Plaintiff could not recall, who had an issue when Ms. Whitcomb told her about a group dance policy that was "an abrupt change from what she originally wanted to do and Ms. Whitcomb didn't … address … her feelings toward that" (SOF ¶¶ 197-198, 204; Dkt. No. 46-13 at 10).

Deerfield, for its part, represents – and Plaintiff does not dispute – that Dr. Taylor, who was Deerfield's Dean of Faculty from 2006 to the end of the 2021-2022 academic year, was never made aware of any complaints against Ms. Whitcomb for the way that she interacted with students or parents, never heard or saw anyone refer to Ms. Whitcomb by the term "Bitchcomb" or any other derogatory term, was not aware of anything that would make Ms. Whitcomb unfit for her position at Deerfield; and was not aware of Ms. Whitcomb ever treating her students

poorly or acting in a mean, cruel, or harmful way toward students (SOF ¶¶ 194-201).  Similarly,

Plaintiff does not dispute that Dr. Austin, Deerfield's Head of School since approximately 2019,

was not aware of any complaints lodged against Ms. Whitcomb by anyone in the past (SOF ¶¶

202-203).

### III.    DISCUSSION

### A.    Count One:  Breach of Contract Against Deerfield

Plaintiff alleges that Deerfield breached contractual obligations it owed to her to protect

her from discrimination by reason of her disability and by retaliating against her for requesting a

reasonable accommodation for that disability (Dkt. No. 15 at pp. 14-15).  Deerfield moves for

summary judgment on Plaintiff's breach of contract claim arguing: (1) that Plaintiff cannot

proceed with any of her claims because her parents expressly waived and released Deerfield and

its employees, on behalf of Plaintiff and themselves, "from any action, claim or suit arising out

of or resulting from any academic or disciplinary action;" (2) that Plaintiff cannot prove the

existence of a contract because the Student Handbook, which sets forth the obligations Plaintiff

alleges Deerfield failed to perform, contains a disclaimer specifically providing that it is "not a

legal contract," and, even if the disclaimer is not dispositive, the language in the Student

Handbook is too vague and indefinite to form a contract; and (3) even if an enforceable contract

existed, Deerfield did not breach it by failing to protect Plaintiff from disability discrimination or

subjecting her to retaliation as she alleges.

Plaintiff does not dispute the validity of the waiver and release but argues that there is a

factual dispute about whether prohibiting her from dancing in *The Nutcracker* performance was

disciplinary or academic such as to fall within its parameters.  Plaintiff further argues that there

is a factual dispute about whether Plaintiff could reasonably expect that the policies and

procedures in the Handbook that she identifies as the basis of her breach of contract claim would be enforced, thereby allowing her breach of contract claim to proceed, and that the language in the Student Handbook is sufficiently definite and certain to be enforceable.  Finally, Plaintiff contends that there is a factual dispute as to whether Defendants acted in conformity with the contract or in violation of the Handbook's anti-discrimination and anti-retaliation provisions when they barred Plaintiff from performing in *The Nutcracker*.

Under Massachusetts law, "any doubts about the interpretation of [a] release must be resolved in the plaintiff's favor," *Cormier v. Cent. Ma. Chapter of Nat'l Safety Council*, 620 N.E.2d 784, 786 (Mass. 1993), and the release in the Enrollment Agreement does little to define the meaning of the terms "academic" or "disciplinary."  For purposes of this ruling, therefore, the court will assume *arguendo* that there is a material factual dispute about the applicability of the release and turn to the questions of whether there is an enforceable agreement between the parties, and, if so, whether there was a breach of the terms of the agreement.

"In the private education context, Massachusetts law has long recognized 'a contractual relationship between the school and the student,' *DMP v. Fay Sch. ex rel. Bd. of Trs.*, 933 F. Supp. 2d 214, 223 (D. Mass. 2013), the governing terms of which are often set forth in a combination of handbooks, policy manuals, brochures and promotional material." *Omori v. Brandeis Univ.*, 635 F. Supp. 3d 47, 52 (D. Mass. 2022) (citing *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997)).  However, "[w]hether a '[student handbook] always constitutes a contract is, arguably, an unsettled issue under Massachusetts law.'" *Finnegan v. Mass. Coll. of Pharmacy & Health Scis. by & through Bd. of Trs.*, Case No. 23-cv-12997-DJC, 2024 WL 4772299, at *7 (D. Mass. Nov. 13, 2024) (quoting *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61 n.5 (1st Cir. 2016) (comparing cases which have held whether a

student handbook constitutes a contract between the student and the school)).  "To determine

whether select terms of a student handbook are contractually enforceable, Massachusetts courts

employ 'the standard of "reasonable expectation,"' that is, 'what meaning the party making the

manifestation ... should reasonably expect the other party to give [the terms]."'  *G. v. Fay Sch.*,

931 F.3d 1, 12 (1st Cir. 2019) (alterations in original) (quoting *Driscoll v. Bd. of Trs. of Milton*

*Acad.*, 873 N.E.2d 1177, 1185 (Mass. App. Ct. 2007)).

 "Courts have held that where there is an express disclaimer in a student handbook or

catalog in which the [school] retains unilateral rights to make changes without notice, any

promises premised on that document are rendered illusory."  *Finnegan*, 2024 WL 4772299, at *7

(finding the handbook in issue did not create a contract where it stated that the school retained

the exclusive control "unilaterally in its sole discretion and without notice" to change any policy

in the handbook) (citing *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 147 (D. Mass. 2021)

(concluding that a disclaimer in an academic catalog that the document was not a contract and

could be changed at any time rendered any promises within the catalog illusory); *Pacella v. Tufts*

*Univ. Sch. of Dental Med.*, 66 F. Supp. 2d 234, 241 (D. Mass. 1999) (holding that the student

handbook terms were not contractually binding on the institution because the express disclaimer

in the student handbook permitted the school to make unilateral changes); *G.*, 931 F.3d at 13

(concluding that the plaintiffs failed to identify sufficiently definite and certain terms in the

handbook to form a binding contract, a conclusion that was reinforced by the statement in the

enrollment contract that the handbook "did not constitute a contract"); *see also Gibson v. Walden*

*Univ., LLC*, 66 F. Supp. 3d 1322, 1325 (D. Or. 2014) (ruling that university student handbook

did not constitute a contract where it "expressly disclaim[ed] the formation of a contract")).

Here, the Handbook expressly stated that it was "not a legal contract," and Deerfield notified

Plaintiff's parents in the Enrollment Agreement that the rules and policies in the Handbook were subject to unilateral changes or updates, about which Plaintiff's parents agreed to remain informed by signing.  Where Plaintiff relies on the Handbook as the basis for her breach of contract claims and the disclaimer of contractual intent in the Handbook is undisputed, Plaintiff should not prevail on her breach of contract claim.  *See Finnegan*, 2024 WL 4772299, at *7.

In urging this court to find that the relevant statements in the Handbook were enforceable promises, Plaintiff argues that the Enrollment Agreement, which the Academy agrees was a contract, referred to and adopted the Handbook by reference.  Plaintiff overstates her case.  It is true that the Enrollment Agreement referred to the Handbook insofar as Plaintiff's parents, by signing it, represented that they had read the Handbook and understood that Plaintiff was subject to the rules and regulations set forth therein (subject to any changes or updates).  The Enrollment Agreement as a whole reserved complete discretion to Deerfield with respect to the content and effect of its rules and regulations governing student behavior. The Enrollment Agreement did not expressly or impliedly adopt the terms of the Handbook or incorporate them by reference (Dkt. No. 40-2).

Plaintiff cites to the *DMP* case for support, noting the court's holding that the handbook in question was a binding contract between the school and its students, notwithstanding a reservation of rights, where the school "require[d] each student and their parents to sign an acknowledgement that they ha[d] received the Handbook for the current academic year."  *Id*., 933 F. Supp. 2d at 223.  With respect, the court finds the holding in *Finnegan* case more persuasive than the holding in *DMP*, in which the court stated without elaboration that it "need not spend much time on [the issue of whether the handbook was a binding contract] between [the school] and its students [because] Massachusetts law has long recognized that in the context of

private education, there is a contractual relationship between the school and the student, the terms of which may include reciprocal rights and obligations set forth in the student handbook." *DMP*, 933 F. Supp. 2d at 223. So far as appears from the *DMP* opinion, while the student handbook retained for the school the right to unilaterally alter, amend, or modify the procedures set forth in the student handbook, the handbook did not include a provision disclaiming its contractual effect or intent. Here, because the Handbook expressly provided that it was not a contract and because Plaintiff's parents acknowledged in the Enrollment Agreement that the rules and regulations in the Handbook were subject to unilateral change in Deerfield's discretion, Deerfield is entitled to summary judgment on Plaintiff's breach of contract claim.

Moreover, even if some provisions in the Handbook, such as the provisions governing disciplinary procedures, could deemed to be contractually binding, *see, e.g., Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 100-01 (D. Mass. 2023) (collecting cases), Deerfield would still be entitled to summary judgment. The court agrees with Deerfield that the particular language in the Student Handbook which Plaintiff invokes as the basis for her breach of contract claim is too vague to give rise to the contractual commitments she asserts Deerfield violated. Deerfield relies principally on the First Circuit's decision in *G. v. Fay School* for support for its contention. In *G.*, a minor student and his parents sued the private school where G. had previously been a student for, *inter alia*, unlawful retaliation for requesting a reasonable accommodation in violation of the ADA and for breach of contract. *G.*, 931 F.3d at 3. The court found that the statements in the student handbook generally declaring the school's "core values" and making "aspirational diversity statements," as well as vaguely promising to "help," "work with," and "respect" students "in physical need," were too vague and indefinite to form a contract, a conclusion that the court reasoned was reinforced by a statement in the signed

24

enrollment agreement that the handbook "set forth general expectations regarding the Student's enrollment at the School," but did "not constitute a contract." *Id*. at 12-13.  Deerfield likens its commitment in its Student Handbook to "an educational environment in which all students are treated with respect and dignity," to the vague aspirational statements in *G*.  Deerfield further argues that the general definitions of discrimination and retaliation in the Handbook are analogous to statements made in a disability services bulletin in *Brown v. Suffolk University*, Civ. Action No. 19-400620-DHH, 2021 WL 2785047 (D. Mass. Mar. 31, 2021), where the university stated that the department "serves as a valuable resource for students with disabilities … to promote an understanding and awareness of accessibility issues … in order to provide a supportive and engaging setting for our students," which were held to be non-contractual in nature  *Id*. at *6.  According to Deerfield, there is language in the Handbook that is not merely aspirational or descriptive, including its promise to "act quickly and decisively" when made aware of acts of discrimination and to "take appropriate steps" to protect community members from retaliation, as well as its warning that incidents of discrimination and retaliation may warrant a disciplinary response.  However, Deerfield maintains that even these statements are too vague and indefinite to constitute enforceable promises.

Plaintiff takes issue with this characterization.  She points to the "Reporting and Resolution Process" for harassment, bullying, and discrimination set out in the Handbook, which she maintains is "sufficiently specific to be contractual."  *See G.*, 282 F. Supp. 3d at 400) (citing *DMP*, 933 F. Supp. 2d at 224-25).  Written policies setting out a school's process for investigating and adjudicating claims that a student has engaged in harassment, bullying, or discrimination have been assumed to be contractual under Massachusetts law.  *See, e.g., Sonoiki v. Harvard Univ.*, 37 F.4th 691, 703 (1st Cir. 2022) (assuming for purposes of the decision that

the provisions used by the university's administrative board to process student disciplinary complaints were contractual where the parties had made the same assumption) (citing *Doe v. Trs. of Boston Coll.* 892 F.3d 67, 80 & n4, 94) (1st Cir. 2018)).  The critical problem with Plaintiff's rejoinder is that she has not alleged a violation of the reporting and resolution procedures. *Contrast DMP*, 933 F. Supp. 2d at 225 ("[T]here is a genuine issue of material fact as to whether Fay adhered to its own policies and procedures in reaching the decision to expel DMP.").  Her allegation is not that Deerfield failed to follow procedures she reasonably expected it to employ in its review of her complaint of discrimination and retaliation, but that Deerfield discriminated against her on the basis of disability by refusing to allow her to wear her custom tutu as a reasonable accommodation for her GAD and then retaliated against her for asking for the accommodation.

Nor does it appear Plaintiff could have substantiated a claim that Deerfield failed to comply with its investigative policies.  The Handbook identifies the Dean of Faculty as a designated official responsible for receiving reports and complaints of violations and requires him personally or through a designee to investigate all such reports or complaints "to determine if the allegations can be substantiated and whether to resolve the complaint through Formal or Informal Procedures" (Dkt. No. 40-5 at 28).  The record reflects that Dr. Taylor became aware of Plaintiff's complaint, conducted an investigation along with Dr. Hills, and found that "Academy policy seem[ed] to have been clearly communicated and implemented," and, while Ms. Thomas invoked the ADA after *The Nutcracker* performance, "[t]here [wa]s no evidence that the ADA was invoked prior to *The Nutcracker* to justify wearing the desired personal-tutu" (Dkt. No. 40-51 at 9).  Thus, Dr. Taylor concluded, there was no need for Formal or Informal Proceedings. While Plaintiff disputes Dr. Taylor's conclusion, she has not identified any deficiencies in the

procedure, nor has she attempted to show that Deerfield's process failed to meet her reasonable expectations about how Deerfield would resolve her complaint.  *See Sonoiki*, 37 F.3d at 704.

As is set forth above, the definition of discrimination in the Handbook is "the mistreatment or [sic] a person based on … disability," and retaliation is "any form of intimidation, reprisal, or harassment by a school community member directed against another school community member for reporting or filing a complaint … or for taking action consistent with this Policy" (Dkt. No. 40-5 at 28).  The Handbook does not define disability, nor does it define "mistreatment."  The Handbook does not specify that the failure to provide a reasonable accommodation for a student with a disability amounts to "mistreatment" of that student. Likewise, the Handbook does not indicate that a student requesting a reasonable accommodation for a disability is taking an "action consistent with this Policy."  In the absence of such language in the Handbook, Plaintiff reaches outside the four corners of the document to the ADA in an effort to give meaning to the Handbook's general terms.[6]  However, Plaintiff has not shown that

---

[6] Plaintiff cites to cases discussing the standard for making a reasonable accommodation request under the ADA and assessing the reasonableness of such requests on pages 18 and 19 of her opposition.  In addition, in footnote 8 on page 18 of her brief, Plaintiff relies on a case in which the court considered whether a major health care system failed to reasonably accommodate employees by exempting them from the requirement that they receive the COVID-19 vaccine to assert that "[t]he fact that Dr. Relin gave an opinion that he could not demand that Ms. Whitcomb allow Lily to wear her custom costume as a 'medical necessity' does not foreclose the issue [that she was requesting a reasonable accommodation]."  *See Adams v. Mass. Gen. Brigham, Inc*., Civil Action No. 21-11686-FDS, 2023 WL 6318821, at *9 (D. Mass. Sept. 28, 2023).  Even if Plaintiff had timely requested a reasonable accommodation (and the record does not support this assertion) it is far from clear that the court could award the ADA-type relief Plaintiff seeks.  Plaintiff has not brought a claim under the ADA and, even if she had, the First Circuit has held that "[i]t was beyond the power of the district court to order a school to suspend its normal codes of conduct in order to tolerate disruptive and disrespectful conduct when that behavior impaired the educational experience of other students and significantly taxed the resources of the faculty and administration."  *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 152 (1st Cir. 1998), *abrogated on grounds related to the Federal Arbitration Act*, *Smith v. Spizzirri*, 601 U.S. 472, 475 n.1 (2024).

a student in her position, having read the Handbook, would reasonably have believed that Deerfield's promise not to treat or allow students to be treated badly based on disability meant that Deerfield was referring to and incorporating the entire ADA – or even just the parts Plaintiff invokes.  Accordingly, Plaintiff's breach of contract claim fails because she has not identified select terms of the Handbook that are sufficiently defined to form enforceable contract terms. For the foregoing reasons, Deerfield's motion for summary judgment on Count One is granted.

    B.  Count Two: Negligent Infliction of Emotional Distress Against Whitcomb

Plaintiff asserts a claim against Ms. Whitcomb in Count Two of her amended complaint for negligent infliction of emotional distress (Dkt. No. 15 at 15).[7]  "'[I]n order to recover for negligently inflicted emotional distress,' a plaintiff must prove the following: '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.'"  *Helfman v. Northeastern Univ.*, 149 N.E.3d 758, 776 (Mass. 2020) (quoting *Payton v. Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982)).  Negligence, in turn, requires proof that "(1) the defendant owed a legal duty to the plaintiff [and that] (2) the defendant committed a breach of that duty …."  *Id*. at 767 (citing *Donavan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 898 (Mass. 2009)).  The first element – the existence of a legal duty – is a question of law for the court.  *Adams v. Congress Auto Ins. Agency, Inc.*, 65 N.E.3d 1229, 1234 (Mass. App. Ct. Dec.

---

[7] To the extent there is language in Count Two of the Amended Complaint that could be read to assert a claim of intentional infliction of emotional distress, the court disregards it.  Plaintiff does not oppose Defendants' motion for summary judgment on the basis that the record would support a finding that Ms. Whitcomb's conduct was "extreme and outrageous and beyond all possible bounds of decency, and was utterly intolerable in a civilized community," such as would be necessary to support a finding of intentional infliction of emotional distress.  *J.S.H. v. Newton*, Case No. 4:21-CV-40086-MRG, 2025 WL 438827, at *15 (D. Mass. Feb. 7, 2025) (citing *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 319 (Mass. 1976)).

21, 2016) (citing *Jupin v. Kask*, 849 N.E.2d 829, 835 (Mass. 2006)).  *See also Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 123 (D. Mass. 2021) ("'Under Massachusetts law, "[w]hether or not a duty of care existed is a question of law for the court."'" (quoting *Doe v. Trs. of Boston Coll.*, 892 F.3d at 93)).  "The 'question of duty is determined by a consideration of "existing social values, customs, and considerations of policy."'"  *McLeod v. Fessenden Sch.*, 624 F. Supp. 3d 45, 50 (D. Mass. 2022) (quoting *Bash v. Clark Univ.*, No. 06745A, 2006 WL 4114297, at *4 (Mass. Super. Ct. Nov. 20, 2006) (quoting *Luoni v. Berube*, 729 N.E.2d 1108, 1110 (Mass. 2000))).

It is well-established that "under Massachusetts law, … a school typically owes a special duty to students that are housed in a facility on its campus," *McLeod*, 624 F. Supp. 3d at 50 (citing *Doe v. Emerson Coll.*, 153 F. Supp. 3d 506, 515 (D. Mass. 2015); *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 335-337 (Mass. 1983)), "particularly … in the case of residential students at the elementary, middle, and secondary levels." *Id.* (citing *Bash*, 2006 WL 4114297, at *4). Duties that have been recognized by Massachusetts' highest court include the duty to take reasonable measures to protect students from harms associated with alcohol-related emergencies when the institution has actual knowledge of conditions that would lead a reasonable person to conclude that a student on campus is in imminent danger of serious physical harm due to alcohol intoxication and so intoxicated that the student is incapable of seeking help for him or herself, *Helfman*, 149 N.E.3d at 771-72; the duty to take reasonable measures to protect a student from self-harm when the university has actual knowledge of a student's suicide attempt while enrolled or recently before matriculation, or a of a student's stated plans to commit suicide, *Nguyen v. Mass, Inst. of Tech.*, 96 N.E.3d 128, 142-43 (Mass. 2018); and the duty to exercise reasonable care in providing residential students with protection from the criminal acts of third parties,

*Mullins*, 449 N.E.2d at 337.  In each of these cases, a critical element was "whether the harm at issue was foreseeable to the [institution]." *Doe v. Brandeis Univ.*, 718 F. Supp. 3d 83, 90 (D. Mass. 2024) (citing *Helfman*, 149 N.E.3d at 771).  "A university's duty to protect its students extends only to those harms which, based on an examination of all the circumstances, were reasonably foreseeable at the time." *Id.* (quoting *Helfman*, 149 N.E.3d at 772) (internal citations and quotations omitted)).  By contrast, in *Brandeis*, relying on First Circuit precedent, the court declined to find that the university had a duty of reasonable care to the plaintiff as a student in conducting investigations into the student's alleged misconduct or a general duty "to provide diligent, fair, impartial, and reasonable treatment of students." *Id.* at 90-91.

The duty as framed by Plaintiff here is a "duty of care to protect the well-being and safety of [Plaintiff], a known vulnerable and emotionally fragile high school boarding student" (Dkt. No. 48 at 26).  Plaintiff states without elaboration that "they" breached that duty without identifying the specific bases asserted for liability.  Plaintiff asserts the negligent infliction of emotional distress claim against Ms. Whitcomb only (Dkt. No. 15 at 15).  The only actions taken by Ms. Whitcomb on which liability could be based are her refusal to allow Plaintiff to wear the custom tutu and her removal of Plaintiff from *The Nutcracker* performance.

After examination of all the circumstances and consideration of social values, customs, and considerations of policy, this court holds that Ms. Whitcomb did not owe a duty to Plaintiff that would have been violated by these decisions.  First, it would not have been reasonably foreseeable to Ms. Whitcomb that prohibiting Plaintiff from wearing her custom tutu in compliance with the costume policy would harm Plaintiff, even accepting that she would be unhappy with the decision.  It is uncontested that Dr. Relin, a mental health professional with knowledge of Plaintiff's condition and some history of a treatment relationship with her, did not

recommend that Ms. Whitcomb make an exception to the policy by allowing Plaintiff to wear her custom tutu.  Moreover, there is no evidence that Dr. Relin's view or recommendation had changed when Ms. Whitcomb followed up with him two days after his initial communication to her.  To the contrary, Dr. Relin assured Ms. Whitcomb that Plaintiff's recent actions did not appear to be a precursor to a nervous breakdown.  Thus, based on examination of all the circumstances, Ms. Whitcomb did not owe a duty to protect Plaintiff that would have extended to requiring her to permit Plaintiff to wear her custom tutu for the performance in violation of the department's policy and practice.

Second, considerations of policy do not support finding that Ms. Whitcomb owed a duty to keep Plaintiff safe that would give rise to liability for Ms. Whitcomb for her decision to pull Plaintiff from performing in *The Nutcracker* on this record.  While removing Plaintiff from the performance would foreseeably cause her emotional distress, the record viewed in the light most favorable to Plaintiff establishes that Ms. Whitcomb became aware of Plaintiff's last-minute decision to wear the Deerfield costume at most one hour before the curtain was scheduled to rise.  Plaintiff had never practiced in either of the Deerfield Sugar Plum Fairy costumes before, and all parties agree that it is essential for dancers to practice in costume for safety purposes before they perform.  The fact that Ms. Whitcomb was initially inclined to let Plaintiff dance and only changed her mind after seeing Ella's distress cannot create a duty where there was none.

This conclusion becomes more evident when considering the scope of the duty Plaintiff appears to be advocating.  Essentially, Plaintiff would have this court recognize a duty of teachers and administrators to protect boarding school students from any acts that, it is reasonably foreseeable, would cause them emotional distress.  Such a duty would be very broad, and it appears inconsistent with the general policy under Massachusetts law that courts should be

cautious about interfering with academic and disciplinary decisions made by private schools. *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 381 (Mass. 2000). Certainly, many actions school administrators or teachers might take vis-à-vis secondary school students would be likely to cause emotional distress, such as not casting a student performer in a coveted role, not granting a student athlete a position on the desired team or the desired position on the team, or not giving a student a grade that is as high as the student hoped or expected. Public policy does not support the imposition of liability on teachers and school administrators for negligent infliction of emotional distress in such circumstances. *Cf. Doe v. D'Agostino*, 367 F. Supp. 2d 157, 175 (D. Mass. 2005) (finding that the plaintiff had not pointed to authority imposing a heightened negligent infliction of emotional distress standard on teachers). This is true even if the student, like Plaintiff, suffers from an anxiety disorder. For these reasons, Defendants are entitled to summary judgment on Count Two of Plaintiff's amended complaint.

    C.   <u>Counts Three: Negligent Retention of Whitcomb Against Deerfield</u>

    Plaintiff's final claim is asserted against Deerfield for its negligent retention of Ms. Whitcomb as the Director of its Dance Department. "Massachusetts recognizes a cause of action for negligent … retention of an employee …. '[which] occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated h[er] unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.'" *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 613 (D. Mass. 2016) (quoting *Foster v. Loft, Inc.*, 526 N.E.2d 1309, 1311 (Mass. App. Ct. 1988)). Plaintiff expends little effort in defending her negligent retention claim. The sole basis advanced for the claim is Ms. Whitcomb's alleged "reputation in the school community," premised on Plaintiff's representations and testimony that seventeen students and one dance instructor

referred to her as "Bitchcomb," a nickname which Plaintiff attributes to Ms. Whitcomb's having been known to have an "iron fist" (Dkt. No. 48 at 27; SOF ¶¶ 206-207).

Plaintiff does not dispute that the Dean of Faculty was unaware of any complaints against Ms. Whitcomb for the way that she interacted with students or parents, never heard or saw anyone refer to Ms. Whitcomb by the term "Bitchcomb" or any other derogatory term, was not aware of anything that would make Ms. Whitcomb unfit for her position at Deerfield, and was not aware of Ms. Whitcomb ever treating her students poorly or acting in a mean, cruel, or harmful way toward students (SOF ¶¶ 194-201). Nor does Plaintiff dispute that the Head of School was unaware of any complaints lodged against Ms. Whitcomb by anyone in the past (SOF ¶¶ 202-203). Plaintiff has not shown actual knowledge on the part of the relevant school administrators. For her negligent retention claim to survive summary judgment, this court would have to find that a triable issue exists as to whether Deerfield should have known that Ms. Whitcomb was unfit for her role as Director of the Dance Department. "[N]o rational view" of Plaintiff's evidence that some seventeen teenagers, plus one instructor, referred to a teacher using a disparaging moniker "warrants a finding" that Deerfield should have known Ms. Whitcomb was unworthy for her role as Director of the Dance Department. *Foster*, 526 N.E.2d at 1311 (quoting *Mullins*, 449 N.E.2d at 338). This meager evidence is insufficient to overcome summary judgment. Therefore, Defendants' motion is granted as to Count Three.

## IV.    CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment (Dkt. No. 38) is GRANTED. Summary judgment shall enter in favor of Defendants on Counts One, Two, and Three of Plaintiff's amended complaint.

It is so ordered.

33

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: March 19, 2025